United States District Court
Southern District of Texas
ENTERED

AUG 2 6 2011

David J. Bradley, Clerk of Court

OPINION

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CINDY MORENO, ET AL., | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-08-504 |
| | § | |
| THE CITY OF BROWNSVILLE, ET AL., | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Defendants have filed a Motion for Summary Judgment to which Plaintiffs have responded in opposition. (Docket Nos. 85, 87). Consent was given by all interested parties to proceed before the undersigned United State Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Docket No. 13). Defendants' Motion for Summary Judgment is GRANTED in PART and DENIED in PART for the reasons that follow.

## FACTUAL SUMMARY

During the late evening hours of November 11, 2008, the City of Brownsville Police Department (hereinafter "BPD") arrived at the 1300 block of East 14th Street, within Brownsville, Texas, to respond to an altercation that culminated in two individuals being stabbed. BPD identified Armando Calderon and Jaime Sanchez as the prime suspects involved in the aforementioned stabbing. BPD officers were alerted to the make, model, and license plate numbers of the vehicle Sanchez drove. Sanchez's abandoned vehicle was found on East 10th Street. This abandoned vehicle became the loci from which the subsequent search team fanned out searching for both Calderon and Sanchez.

Meanwhile, Calderon and Sanchez had parted company at some unknown point after the stabbing altercation. Calderon was quickly found, apprehended, and taken into BPD custody. Contemporaneously, police officers searching the abandoned vehicle found evidence, on a pawn ticket receipt, of Sanchez's address as

being 1703 East Van Buren.   BPD sent officers to that 1703 East Van Buren address in an attempt to locate Sanchez, but that home was found empty.

During the search for Sanchez, a subsequent call came into BPD dispatchers. The caller, with slurred speech and seemingly under the influence of an unknown stimulant, advised dispatchers that a highly intoxicated man named Luis —wearing red shorts— was behind Juan's Mechanic Shop.

Defendant Dispatcher Ida Villarreal converted the information above into an unequivocal pronouncement that Sanchez was seen behind Juan's Mechanic Shop and had since entered a personal residence located at 1634 East Van Buren. Villarreal never communicated to officers that the suspect in the subsequent call was attributed with a name, intoxication level, and a particular style of dress. Although tasked with verifying information received, Villarreal did nothing to verify the information she relayed to BPD officers in the field.[1]

The 1634 East Van Buren address was the personal residence of Ricardo Moreno.   A BPD officer, en-route to the 1703 East Van Buren address, had been unable to find a closer parking spot and was forced to park in front of Moreno's home who lived down the street from the initial address of interest.   Moreno had been sitting on his front porch and as the officer parked his car Moreno had risen and gone into his home closing the door behind him.[2] When the officer above first arrived at Moreno's home, he was doing nothing more than utilizing the street space in front of Moreno's home to park his car so he could proceed on foot to Sanchez's home.   After Villarreal's communication indicating entry in Moreno's home, BPD

---

[1] There is some evidence in the record that Villarreal was told by the other dispatcher that the person involved in the subsequent phone call had abruptly hung up. When this happened Villarreal had the discretion and ability to send a police officer to the place where the second phone call was made in an attempt to more fully verify the information provided.  Villarreal elected not to do this for some unexplained reason.  See Dep. Test. of [Dispatcher] Karla Garcia at 127.  (Docket No. 85, Ex. H) (Garcia testified that "if someone wanted to dispatch to make contact with the person on the pay phone, who would actually call the officers, you or Ida [Villarreal]? A: Ida.  Q: Ida would?  A: Yes. That's her call.  That's her radio.").

[2] "Q: When you heard the call that someone had gone into the residence, that's when you drove to the house?  You're not saying you saw someone run into house? A: No, I did not see – I saw Mr. Moreno close the door to the house when I arrived.  Q:  When you were still in your unit?  A: Yes." Dep. Test. of Sgt. R. D. Jesse. (Docket No. 85, Ex. J).

approached the home and surrounded it with police officers.  First-arriving police officers knocked on the door, but the door was not answered.  Defendant Lt. Mascorro was the officer-in-charge of the scene until Defendant Arnold arrived later on.

BPD claims that it could see into the living room of Moreno's home, but Plaintiffs' dispute that BPD could have seen into the living room given the presence of blinds, curtains, and other obstructions.  BPD claims that Moreno was sitting in his living room on a couch and was not responding to its requests.  Simultaneously police officers began to surround the home and cover all of possible exists.

While police officers were surrounding Moreno's home, several neighbors emerged and appraised BPD that Moreno was a loner that seldom had guests.[3] Neighbors also told officers that Moreno was not mentally stable and that he had often been overheard yelling in a nonsensical fashion[4] and that BPD must be mistaken and should leave Moreno alone.[5]  Police officers threatened to arrest anyone who did not go in their home.[6]  Most importantly, no one saw anyone run into Moreno's home.[7]

---

[3]*See* Dep. Test. of Fernando Fernandez at 13-14.  (Docket No. 87, Ex. L) (describing Moreno's lack of visitors); *see also*, Dep. Test. of Gerald Z. Salazar at 16  (Docket No. 85, Ex. N) (describing how after years of friendship Salazar had never been granted admittance to Moreno's home); Dep. Test. of Lt. Adrian Mascorro at 25-26.  (Docket No. 87, Ex. A) (describing that a man named Luis told police officers that Moreno was a loner).

[4]In fact, the office-in-charge on the scene specifically acknowledged hearing some of this puzzling screaming. See Dep. Test. of Lt. Adrian Mascorro at 30.  (Docket No. 87, Ex. A) ("Well personally, he wasn't making any sense in his statements.  He was saying that he thought we the were post office even though we announced ourselves as Brownsville PD.  We're in full uniform.  He was telling us to just leave the mail there and, you know – just rambling on and not making any sense in his statements.  Rambling on about the mail, just to leave it here.")

[5] *See* Dep. Test. of Gerald Z. Salazar at 26  (Docket No. 85, Ex. N) ("I was telling them that he was not doing well and they were still being stubborn.")

[6] *See* Dep. Test. of Fernando Fernandez at 26.  (Docket No. 87, Ex. L) ("They told me to shut up and to go into the house."); *see also*, Dep. Test. of Gerald Z. Salazar at 16  (Docket No. 85, Ex. N) ("And that's when I went over there and I was going to tell, "Wait, wait, Jaime Sanchez ins't even"— because I was there— "Jaime Sanchez lives over there." [the officer replied] "You get back there or you want to get arrested?" ... "No, no, no, no. Sir, you want to get arrested?" ... "No" ... "Well, get back in your house."); Dep. Test. of Gerald Z. Salazar at 21  (Docket No. 85, Ex. N) ("And then I told them, hey, leave him alone, he's not well mentally-wise. And they told me to shut up.  And they told me to shut up and go into your house. [But] I was already inside my house . . . .").

[7] "Q: As far as you know did any of the police officers see a suspect run into the house? A: As far as we know – that I know, no." Dep. Test. of Ofr. Viviana Trevino at 42-43.  (Docket No. 85, Ex. A). See

Mascorro then decided to enter Moreno's home without a warrant. Mascorro, and one of his subordinates, kicked Moreno's door repeatedly until it was broken open. Defendant Rodriguez, and two of his subordinates, then entered the home.[8] What Rodriguez found inside is the subject of much dispute. Defendants claim that Moreno was wielding a knife and lunged at them.[9] Plaintiffs counter that there was no knife and Moreno simply ushered them out of his house which was completely within his rights.[10] Neither party disputes that Moreno was alerted by BPD's entry and did not appear to be injured in any way. Neither party disputes that the officers who initially entered Moreno's house left the house uninjured. Neither party disputes that Moreno stayed inside of his house after this episode and presented no threat to anyone outside of his home.

The amount of police officers arriving at the scene was described akin to an unstoppable deluge.[11] BPD stood outside of Moreno's home for a period of time deliberating what to do next. Mascorro while standing on Moreno's porch proceeded to create several holes through Moreno's door so that Mascorro could see what was going on inside the house.[12] Mascorro decided to fill the small house with several pepper spray canisters in the hope of trying to get Moreno out of the home.[13]

---

also, *See* Dep. Test. of Lt. Adrian Mascorro at 17. (Docket No. 87, Ex. A) (describing how he, the officer-in-charge, had no knowledge that someone had seen the fugitive run into Moreno's home).

[8] See Dep. Test. of Lt. Adrian Mascorro at 27. (Docket No. 87, Ex. A) (describing how the door had broken and how BPD officers had pierced holes through it).

[9] See Dep. Test. of Lt. Adrian Mascorro at 24. (Docket No. 87, Ex. A) ("All I know is that he had already threatened us with a knife.").

[10] Plaintiffs are obviously not able to put forth Moreno's testimony as to whether he had a knife or not, and so they rely on circumstantial evidence, that the Court points out later in this opinion, to try to establish a triable issue as to whether Moreno actually possessed a knife. *See e.g.*, Hr.'g Tr. at 52-53 (Docket No. 89) ("See Your Honor, I'll also – in presentation of the facts of this case, I think there's going to be a dispute as to whether or not there ever was a knife, a knife that was brandished and used. I mean the killers say yes, there was, the victim of course is not able to argue his position. But we have had a series of incidences where the knife has been described in more than one way, and issues as to whether or not we could get it and if there's any . . . . ").

[11] "Then what happened, the cops all go out, right, they stay there, then more cops are coming in and even regular cars and park – Q: Where are they [the police], in the front, in the yard . . . No, they were outside the yard and – but now they're inside the yard, they're outside the yard, they're in the street. By this time they're almost everywhere. Now more cops are coming in . . . And then even more cops started arriving after that and then . . ." Dep. Test. of Fernando Fernandez at 29. (Docket No. 87, Ex. L)

[12] Dep. Test. of Lt. Adrian Mascorro at 27. (Docket No. 87, Ex. A)

[13] *Ibid.*

Moreno placed a fan on one of his windows that circulated the pepper spray back outside and out of his home.  Through the very holes that Mascorro created, Moreno then tossed what smelled like coffee at the police officer standing on his porch.  Neither party alleges that the coffee water landed on any police officer.

Neighbors and bystanders began to laugh at the police[14] and continued to encourage the police to leave Moreno alone.  Such encouragements were met with arrest threats.[15]  Plaintiffs argue that it was exactly because of this ridicule that the Special Weapons and Tactics Team (hereinafter "SWAT team") was summoned.  Defendants argue that the escalation of force was necessary independent of the ridicule.  The escalation of force was severe.  Nineteen SWAT team members, led by Defendant Sgt. Arnold, equipped with a wide-range of weapons arrived at Moreno's home[16] in a 2006 Lenco BearCat Armored Transport.[17]  Defendant Paschall, the highest-ranking member of the SWAT,[18] arrived at the scene shortly thereafter.  The Chief of Police also arrived virtually at the same time as Paschall but via other means of transportation.

Upon arrival Paschall summoned a crisis negotiator.  Defendants argue that the crisis negotiator, from within the BearCat via a loudspeaker, attempted to make contact with multiple suspects inside the residence.  Plaintiffs dispute this fact and claim that the crisis negotiator only sought to make contact with Moreno therefore

---

[14] *See* Dep. Test. of Fernando Fernandez at 13-14.  (Docket No. 87, Ex. L) (describing how "everybody started laughing with that one" after officers were unable to extract Moreno after entering his home)

[15] *See supra,* n.6 (describing the various times neighbors encouraged police to leave Moreno alone).

[16] Arnold testified that the City of Brownsville had 23 total SWAT team members on the day Moreno was killed, meaning that 19 of the 23 would have been most of the entire SWAT team. See Dep. Test. of Sgt. Troy Arnold.  (Docket No. 87, Ex. B) ("How many people were on SWAT not at the incident but were on SWAT November of 2008? . . . Approximately 23 total.  There would have been about 18 that were there that night, 19").

[17] The 2006 Lenco BearCat Armored Transporter is a four-wheel drive vehicle that can hold about 10-12 people inside.  See Jose Borjon, "Brownsville Police Department Gets New Armored Toy" http://old.brownsvilleherald.com/ts_comments.php?id=74441_0_10_0_C  (last visited on Aug. 25, 2011).  The entire vehicle, including the windows, is bullet proof.  *Ibid.*  The BearCat can travel up to 65 miles per hour and is considered necessary in high-risk situations. *Ibid.*

[18] Then-Lieutenant Paschall has since been promoted to Commander. Aff. of Cdr. James Paschall at 2 (Docket No. 85, Ex. D).

evincing that Police knew Moreno was the only person within the home long before they went in again.[19]

A plan was devised to extract Moreno from his home. Defendant Arnold was the architect of the plan that was explained to, approved by, and supervised by Defendants Paschall and Garcia on the scene. The first portion of this plan called for the SWAT team to deploy five canisters of CS gas[20] into the residence. The second portion was to reinforce the perimeter and employ a pole camera, whether through a broken window or the broken door is unknown, to determine the layout of the home and the location of its occupants. The SWAT team determined that no other occupants were within the house.

Defendants Arnold, Paschall, and Garcia approved a second entry into Moreno's home. As a dozen SWAT team members, in two groups led by a riot shield-holding officer each, entered Moreno's home they selectively cleared every room. Defendant Arnold personally participated in this entry.[21] After clearing every room they moved to Moreno's bedroom where they found him sitting on his bed. Here again there is a strong dispute. Officers allege that Moreno was holding a knife and that they yelled at him several times to drop the knife. Plaintiffs' dispute the presence of the knife and at least one of Plaintiffs' witnesses has testified that he heard no such knife-related requests.[22]

SWAT team members claim that failure to heed their demands led them to shoot Moreno six times with less-than-lethal rounds because Moreno never gave up control of the knife. Plaintiffs dispute that the knife, assuming it was there, was

---

[19] *See* Dep. Test. of Det. David Martinez at 85. (Docket No. 87, Ex. M) (Martinez testified that "the only name I have given to me is Ricardo, possibly Ricardo Moreno").

[20] While Mascorro was in charge of the scene OC spray, commonly known as pepper spray, was the only chemical agent employed. See Dep. Test. of Sgt. Troy Arnold at 42 (Docket No. 87, Ex. B). When SWAT arrived they brought with them CS gas. *Ibid* at 43. CS gas is considered a more serious form of chemical agent, an irritant, while OC spray is considered a less serious form of chemical agent, an inflammatory. *Ibid.*

[21] Dep. Test. of Sgt. Troy Arnold at 48 (Docket No. 87, Ex. B).

[22] *See* Dep. Test. of Fernando Fernandez at 33. (Docket No. 87, Ex. L) (describing how "I saw that they went into his bedroom. And I just heard that they told him, get down, get down, and that was it.")

never dropped given that Moreno was shot so many times. BPD concedes that Moreno placed down the knife at least twice, but that it was unable to procure it before Moreno picked it back up. A small group of police officers then lunged at Moreno with the first officer slamming up against him using a riot shield. Another officer held one of his arms while two more were on top of him pressing him with the riot shield. In BPD's version of events Moreno freed himself from all the officers struggling with him, gained possession again of the knife, and then lunged at a SWAT team member a total of three times with the knife. According to BPD Moreno allegedly cut Arnold on his third lunge. BPD officers discharged their firearms loaded with live ammunition a total of nine times. Six of those rounds hit Moreno and proved fatal.

As Moreno lay dead, every room in his home had been searched; police weaponry, fifteen bullet casings, and more than half a dozen canisters of gas littered his home; the utilities had been turned off; his door and most of his windows laid shattered; his yard trampled by the nearly 30 or more police officers that had surrounded his home over the course of several hours; his neighbors fearful and unable to leave their homes, and the four-wheel drive 2006 Lenco BearCat Armored Transporter sitting in front of his home. Jaime Sanchez was not, and never had been, in Moreno's home.

## JURISDICTION

This is a civil rights complaint brought pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1343, alleging violations of the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution.

## PROCEDURAL HISTORY

Plaintiffs initiated this action in a court of the State of Texas, and later Defendants removed this action to the Southern District of Texas, Brownsville, Division, on December 12, 2008. (Docket No. 1). All interested parties consented to proceed before the undersigned United States Magistrate Judge pursuant to 28

U.S.C. § 636(c). (Docket No. 13). The history of this case has been considerably lengthened because the Court held in abeyance these proceedings pending the culmination of related criminal investigations. (Docket No. 34).

The operative complaint, the First Amended Complaint, was filed on August 20, 2010. (Docket No. 54). Defendants filed a Motion to Dismiss Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure that the Court granted in part and denied in part. (Docket No. 59). Thereafter, on July 15, 2011, Defendants filed a Motion for Summary Judgment. (Docket No. 85). Plaintiffs filed their response in opposition to the Motion for Summary Judgment on August 5, 2011. (Docket No. 87). The Court provided both parties with the opportunity to present their respective arguments on August 9, 2011. (Docket No. 89).

## THE SUMMARY JUDGMENT STANDARD

Summary Judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c) (2010). "The movant bears the burden of identifying those portions of the record it believes demonstrates the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.,* 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp v. Catrett,* 477 U.S. 317, 322-325, 106 S.Ct. 2258, 91 L.Ed.2d 265 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by " 'showing'—that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *See Celotex,* 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.,* 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas,* 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the non-movant's response."

*United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

The moving party bears a heavier burden when seeking summary judgment on a claim or defense on which it would bear the burden of proof at trial. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). "Thus, if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor." *Id.; see also, Meecorp Captial Markets LLC v. Tex-Wave Industries LP*, 265 Fed. App'x 155, 157 (5th Cir. 2008) (per curiam) (unpublished) (quoting *Fontenot*).

## DISCUSSION

Defendants have filed a Motion for Summary Judgment arguing the absence of municipal liability on the City's behalf; the individual defendants' entitlement to qualified immunity; and the absence of a genuine issue of material fact concerning the underlying constitutional violations alleged. Defendants argue that the City is entitled to sovereign immunity for the state-based claims and also argue that the individual defendants cannot be sued in conjunction with the City under Texas law. In support of these arguments Defendants have attached the following evidence to their Motion for Summary Judgment:

Dep. Test. of Officer Viviana Trevino. (Docket No. 85, Ex. A); Dep. Test. of Sgt. Jose Davila, Jr. (Docket No. 85, Ex. B); Dep. Test. of Ida Villarreal. (Docket No. 85, Ex. C); Aff. of Cdr. James Paschall. (Docket No. 85, Ex. D); Dep. Test. of Officer Rene Rico. (Docket No. 85, Ex. E); Aff. of Carlos Garcia. (Docket No. 85 Ex. F); Dep. Test. of Officer Luiz Perez. (Docket No. 85, Ex. G); Dep. Test. of Karla Garcia. (Docket No. 85, Ex. H); Dep. Test. of Marian Culver-Kingsbury. (Docket No. 85, Ex. I); Dep. Test. of Sgt. R. D. Jesse. (Docket No. 85, Ex. J); Dep. Test. of Lt. Raul Rodriguez. (Docket No. 85, Ex. K); Dep. Test. of Lt. Adrian Mascorro. (Docket No. 85, Ex. L); Aff. of Defs.' Expert Cdr. Albert Rodriguez. (Docket No. 85, Ex. M); Dep. Test. of Gerald Z. Salazar. (Docket No. 85, Ex. N); Dep. Test. Sgt. Troy Arnold.

(Docket No. 85, Ex. O); Copy of City of Brownsville City Charter. (Docket No. 85, Ex. P).

Plaintiffs oppose Defendants' motion and have filed a response detailing the basis for that opposition. (Docket No. 87). Plaintiffs have also submitted substantial evidence with the aim of establishing the existence of genuine issues of material fact as to all of their claims:

Dep. Test. of Lt. Adrian Mascorro. (Docket No. 87, Ex. A); Dep. Test. of Sgt. Troy Arnold. (Docket No. 87, Ex. B); Dep. Test. of Karla Garcia. (Docket No. 87, Ex. C); Dep. Test. of Ida Villarreal. (Docket No. 87, Ex. D); Dep. Test. of Lt. Raul Rodriguez. (Docket No. 87, Ex. E); Dep. Test. of Charles D. Carter. (Docket No. 87, Ex. F). Dep. Test. of Sgt. Jose E. Davila, Jr. (Docket No. 87, Ex. G); Dep. Test. of Ofr. Gilbert Briones. (Docket No. 87, Ex. H); Dep. Test. of Ofr. Rene Rico. (Docket No. 87, Ex. I); Dep. Test. of Sgt. R.D. Jesse. (Docket No. 87, Ex. J); Dep. of Gerald Z. Salazar. (Docket No. 87, Ex. K); Dep. Test. of Fernando Fernandez. (Docket No. 87, Ex. L); Dep. Test. of Det. David Martinez. (Docket No. 87, Ex. M); Dep. Test. of Ofr. Adrian Zarate. (Docket No. 87, Ex. N); Dep. Test. of Sgt. Eduardo R. Zuniga. (Docket No. 87, Ex. O).

Collectively, Plaintiffs and Defendants submitted more than a 1000 pages of evidence and testimony for the Court's consideration in arriving at the decisions that follow.

## MUNICIPAL LIABILITY

It is well established that a city is not liable under § 1983 on the theory of respondent superior. *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010) (citing *Monell v. Dept' of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Nevertheless, a plaintiff may establish municipal liability under § 1983 by showing the deprivation of a federally protected right caused by action taken "pursuant to an official municipal policy." *See ibid.* Moreover, a plaintiff must identify: "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose

'moving force' is that policy or custom." *Ibid* at 541-42 (citing *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002)).

The City argues that "Plaintiffs have not articulated any facts or evidence that support the argument that the moving force behind Decedent Moreno's injuries was a policy, practice or custom [of the City of Brownsville] . . . ." Defs' Mot. at 21. (Docket No. 85). The City's argument as to this claim is persuasive.

The Plaintiffs have not supplied sufficient evidence, notwithstanding an extensive discovery period and an already voluminous record, to establish a genuine issue of material fact as to this claim. Plaintiffs cannot point to any policy or custom that the City is responsible for implementing, ratifying, or deliberately overlooking. Without an arguable policy or custom it is impossible to determine who the policy maker was and whether that unidentified policy or custom led to a constitutional violation. *See Valle*, 613 F.3d at 542 (ruling that the policymaker must have knowledge of the policy or custom). For their part, Plaintiffs argue that the absence of a policy is a policy itself. See Mot. Hr'g Tr. at 43. This is not a novel argument.

In 1980 a City of Brownsville police officer shot and killed an individual. *See Rodriguez v. Avita*, 871 F.2d 552 (5th Cir. 1989). Plaintiffs there alleged that by taking a hands-off approach the city commissioners had in effect delegated policymaking authority to the Chief of Police. *See ibid* at 553. The Fifth Circuit Court of Appeals was unconvinced. *See ibid* at 555 ("Such a pleading does no more than describe a single incident of arguably excessive force applied by one officer"). Likewise here all of the challenged events happened in what can only be characterized as a single incident.

A single decision by a policy maker may, under certain circumstances, constitute a policy for which a municipality may be liable. *Brown v. Bryan County*, 219 F.3d 450, 462 (5th Cir. 2000). However, this "single incident exception" is extremely narrow and gives rise to municipal liability only if the municipal action is a final policy maker. *See Valle v. City of Houston*, 613 F.3d 536 (5th Cir. 2010) (citing *Bolton v. City of Dallas*, 541 F.3d 545, 548 (5th Cir.2008)). Plaintiffs have no

evidence that Garcia was a policy maker for the purposes of *Monell*, and so even if the Court were inclined to invoke the single incident exception, no policy maker was involved in the challenged incident.

The Court appreciates Plaintiffs' concern that "if their [meaning the City's] theory is correct, they forever take away the risk of municipal liability. No policy, no liability." Mot. Hr'g Tr. at 43, (Docket No. 89). This concern is alleviated through the operation of the custom or pattern line of cases. *See e.g., Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 850 (5th Cir. 2009). In *Peterson*, the Fifth Circuit made it clear that a "pattern is tantamount to official policy when it is 'so common and well-settled as to constitute a custom that fairly represents municipal policy. 588 F.3d at 850. It is thus clear "that a plaintiff must demonstrate 'a pattern of abuses that transcends the error made in a single case." *Ibid* at 850-51. Usually custom or pattern cases turn on whether the incidents alleged are sufficient to establish a pattern or custom. *See e.g., Pineda v. City of Houston*, 291 F.3d 325 (5th Cir. 2002) (holding that eleven incidents of warrantless entry did not support a pattern of unconstitutional warrantless entry). The Court therefore appreciates Plaintiffs' concern, but thinks it inaccurate to claim that the absence of a policy will forever shield the City given the viability of establishing an official policy through pattern or custom.

In light of all of the above, the Court finds it impossible, as a matter of law, for the City of Brownsville to be held liable for the incidents of November 11, 2008, for violations of constitutional law involved herein.

<u>QUALIFIED IMMUNITY</u>

The doctrine of qualified immunity protects public officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Jennings v. Patton*, 644 F.3d 297 (5th Cir. 2011) (citing *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009)). As the *Pearson* Court established, we may address these two prongs in either order. 555 U.S. at 818. A qualified

immunity ruling is a legal issue that can be decided with reference only to undisputed facts. *Johnson v. Jones*, 515 U.S. 305, 313 (1995) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 530, n.10 (1985)). The qualified-immunity inquiry in this case requires the Court to determine whether BPD's actions were objectively unreasonable, in light of the clearly-established law at the time, and in light of the information BPD possessed. *Wagner v. Bay City, Tex.*, 227 F.3d 316 (5th Cir. 2000).

   a. *Dispatcher Ida Villarreal*

   Plaintiffs claim that Dispatcher Ida Villareal violated Moreno's rights by intentionally, or recklessly, failing to investigate the phone call that she erroneously believed communicated to her that Sanchez had entered Moreno's home. Plaintiffs base this claim largely on two Eighth Circuit Court of Appeals cases: *Brockington v. City of Sherwood, AR*, 503 F.3d 667 (8th Cir. 2007); and *Wilson v. Lawrence County*, 260 F.3d 946 (8th Cir. 2001). Admittedly the Court is not bound by the circuit court opinions outside the Fifth Circuit, but the Court nevertheless has considered all the authority Plaintiffs provided. Nevertheless, even under Eighth Circuit precedent, negligent failure to investigate does not violate due process. *See Wilson*, 260 F.3d at 955 (citing *Daniels v. Williams*, 474 U.S. 327, 334, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)). Whether Villarreal's behavior on November 11, 2008, was reckless or simply negligent is an incredibly close and difficult call.

   Nevertheless, Villarreal is entitled to qualified immunity as a matter of law even assuming her conduct was grossly reckless. The district court in *Wilson* noted that only reckless or intentional failure to investigate other leads offends a defendant's due process rights. *Wilson*, 260 F.3d at 955 (citing *Sanders v. English*, 950 F.2d 1152, 1162 (5th Cir.1992) (denying qualified immunity where evidence could support a finding that defendant had deliberately ignored exonerating information indicating he had arrested the wrong person)).

   The Fifth Circuit in *Sanders* recognized that police officers may be liable for illegal detention under § 1983 for deliberately ignoring exonerative evidence or conducting a reckless investigation. *Sanders*, 950 F.2d at 1162. More importantly to the present analysis is what *Sanders* did not recognize:

> Sanders did not recognize an independent constitutional claim for being subjected to a reckless investigation; instead it acknowledged that conducting a reckless investigation could support other claims for violations of established constitutional rights.   In that case, we reversed the grant of summary judgment to the defendant officer on plaintiff's claim for illegal detention, not reckless investigation.

*Hernandez v. Terrones*, 397 Fed. App'x. 954 (5th Cir. 2010) (unpublished).   In *Hernandez*, the Fifth Circuit Court of Appeals held that in 1994 "reckless investigation" was not a clearly established stand-alone constitutional right at the time of the events in question. *Hernandez*, 397 Fed. App'x at 12. While *Hernandez* is an unpublished decision concerning a 1994 incident, the research evinced in the Fifth Circuit's opinion is very persuasive and leads the Court to conclude that assuming Villarreal did violate Moreno's rights, the right alleged was not clearly established on November 11, 2008.[23]   Because Plaintiffs have not convinced the Court that this right was clearly established, Defendant Villarreal is entitled to qualified immunity, notwithstanding here less-th4an-meritorious conduct on November 11, 2008. *See Jennings*, 644 F.3d 297.

  b. *The Individual Police Officers*

Defendants largely conceded that cognizable constitutional violations have been alleged. See Mot. Hr'g Tr. at 23, 66 (Docket No. 89). They also concede that by and large most of the claims herein are clearly established.[24] *Ibid.*   Defendants, however, vehemently dispute that the individual officer's actions were objectively

---

[23] Presumably, if that right is still not recognized, see generally *Hernandez*, 397 Fed. App'x. 954, it is fair to say it was not clearly established in November 2008. The Fifth Circuit never explicitly recognized the existence of the right. *Ibid.* In fact, the Fifth Circuit went to great lengths to explain that *Sanders* did not establish the right alleged herein. *Ibid.* Plaintiffs offer no authority that could lead the Court to conclude that the right was clearly established in November 2008. *Jennings v. Patton*, 644 F.3d 297.

[24] Defendants did dispute the clearly established nature, and really applicability given the Plaintiffs' version of the facts, of the Fourteenth Amendment rights that Plaintiffs advanced. See Mot. Hr'g Tr. at 22 (Docket No. 89). As explained in various parts of this opinion, the Court agrees that no viable Fourteenth Amendment-based claims should survive this opinion and proceed to trial.

unreasonable in light of the circumstances presented to them. *Ibid.* But therein lays the very complexity of the present situation: the circumstances presented to them are strongly disputed. The present analysis is a very difficult one even assuming that the facts were undisputed.

But many material facts are genuinely disputed. These include but are not limited to Moreno's position upon police arrival at his home; whether police officers really heard what appeared to be someone else's footsteps; whether police officers could observe Moreno inside his home notwithstanding blinds, curtains, and furniture being in the way; and none probably more central than whether Moreno had a knife at all the various times that Defendants claim it justified their actions.[25]

For example, much of Defendants' claims of objective reasonableness arise from the claim that the decedent attacked police officers with a knife. The Court has little choice but to conclude, for the purposes of this motion, that the decedent did not possess a knife. *See Valle v. City of Houston*, 613 F.3d 536, 540 n.1 (5th Cir. 2010) ("In its summary judgment opinion, the district court improperly resolved the factual dispute about whether [the decedent] possessed a hammer in the City's favor. It should have credited [Plaintiffs'] testimony that [the decedent] did not have a hammer.").

Let the Court be perfectly clear. The Court understands Plaintiffs' version of the relevant events is hotly contested, and the Court makes no judgment as to the veracity of those claims. *See e.g., Morelli v. Webster*, 552 F.3d 12, 25 (1st Cir. 2009) (explaining that although the factual issues that the court was presuming to be true

---

[25]Plaintiffs' evidence of the non-existence of the knife is based on their arguments that looking at many of the involved-officer-depositions it becomes apparent that no cogent and consistent description of the knife exists across all the testimony. Who actually saw the knife, as opposed to heard from someone else, is just one of the many outstanding factual issues. In this case, Plaintiffs and Defendants use the same deposition evidence in support of their respective theories. Nevertheless, the genuine issue of material fact arises in the disagreement over what the evidence factually suggests. Looking at all the evidence provided in its totality, the Court is confident that a reasonable jury could find for either party's interpretation of what facts the evidence establishes as both theories possess persuasive appeal. Defendants allege that "the knife fell after he was shot, and they recovered it and sent it to the evidence lab at DPS. It, I believe, is back at the police department." Mot. Hr'g Tr. at 40 (Docket No. 89). Plaintiffs' attempted to gain access to the knife for the purposes of building their case but Defendants' asserted law enforcement privilege, which the Court respected, based on an ongoing criminal investigation. *Ibid* at 53.

were hotly contested the operation of the summary judgment standard required acceptance of plaintiffs' facts).

It is clear to the Court that at this juncture too many genuine issues of material fact outstanding for the Court to intelligently rule on whether any of the defendant-officers are entitled to qualified immunity. There is simply no cogent set of undisputed facts from which the Court can draw in intelligently undertaking the oft-complicated qualified immunity analysis. Again a qualified immunity ruling is a legal issue that can be decided with reference only to undisputed facts. *Johnson*, 515 U.S. at 313 (1995).

Therefore, qualified immunity is DENIED as to all the remaining defendants. Nevertheless, nothing in this opinion and order should be read to preclude Defendants from rearguing qualified immunity once the facts become undisputed.

<u>I</u>
FOURTH AMENDMENT VIOLATIONS

a. <u>The Initial Entry</u>

It is axiomatic that "'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion' "stands "'[a]t the very core' of the Fourth Amendment." *Kyllo v. United States*, 533 U.S. 27, 31, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)).  Supreme Court cases firmly establish the " 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (footnote omitted).  Thus, "absent exigent circumstances, a warrantless entry to search for weapons or contraband is unconstitutional even when a felony has been committed and there is probable cause to believe that incriminating evidence will be found within." *Ibid*, at 587-588, 100 S.Ct. 1371.

It is undisputed that BPD officers did not have a warrant to enter Moreno's home, and therefore, their search of Moreno's home was presumptively unreasonable. *Ibid.*  It is also largely undisputed that before police officers knocked

on Moreno's door the first-responding officer saw him sitting on his front porch and then saw Moreno get up of his own volition and go inside his home closing and locking the door behind him. See Dep. Test. of Sgt. R. D. Jesse at 30. (Docket No. 85, Ex. J). With this undisputed fact in the record, Defendants offer a myriad of unpersuasive justifications for their presumptively and objectively unreasonable behavior.

### 1. *Hot Pursuit Exigency*

Defendants initial justification that "hot pursuit" of a suspect is a recognized exigency justifying a warrantless search is legally correct. (Docket No. 85 at 29-30) (citing *Welsh v. Wisconsin*, 466 U.S. 740, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984); *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 2409-10, n.3, 49 L.Ed.2d 300 (1976); *Payne v. City of Olive Branch*, 130 Fed. App'x. 656 (5th Cir. 2005)). The authorities Defendants cite, however, are not fit for the task for which they have been summoned in this case.

First, Moreno was not the suspect being sought as the first-responding officer to Moreno's home knew before approaching the home. *See* Dep. Test. of Sgt. R. D. Jesse at 30. (Docket No. 85, Ex. J). This fact alone makes *Welsh* and *Santana* inapposite. *See Welsh*, 466 U.S. at 743 ("without securing any type of warrant, the police proceeded *to the petitioner's home*") (emphasis added); *see also, Santana*, 427 U.S. at 42 ) ("the only remaining question is whether *her act of retreating into her house* could thwart an otherwise proper arrest. We hold that it could not.") (emphasis added). Because the police sought Jaime Sanchez, not Ricardo Moreno, *Steagald v. United States*, 451 U.S. 204, 215, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981); is controlling. In *Steagald*, the Supreme Court held that in the absence of consent or exigent circumstances, a search warrant was required before law enforcement officers could search the home of a third-party for the subject of an arrest warrant. *United States v. Ward*, 561 F.3d 414, 420 n.17 (5th Cir. 2009).

*Payne*, although a bit more on point is also distinguishable. 130 Fed. App'x. 656. In *Payne*, two officers, the first being the initial hot pursuer and the second a backup officer that aided the initial officer in executing the suspect's arrest in a

third-party's home, were sued by the suspect in a civil rights action akin to the present one. The central issue in *Payne* was whether the initial officer had actually been in hot pursuit of the plaintiff before arresting him within a third-party's home. The Fifth Circuit in *Payne* ruled that a second-responder could rely on radio traffic evincing a "hot pursuit." *Payne*, 130 Fed. App'x. 656 (2005).[26]   This is the proposition for which Defendants cite the case. (Docket No. 85 at 30) ("Savage could have reasonably believed, based on the police radio traffic, that the officers were in hot pursuit of a suspect."). Based on this reliance the Fifth Circuit Court of Appeals held that the responding officer reasonably relied on the first officer's declaration of an ongoing hot pursuit. *Ibid.*

But the Fifth Circuit did not stop there. The Fifth Circuit made it clear that the issue of whether there had been a hot pursuit at all was a genuine issue of material fact precluding summary judgment in the officer's favor, even as to the qualified immunity grounds, given that there were material inconsistencies between the plaintiff's and defendant's testimony as well as multiple inconsistencies in the defendant's testimony itself. *Payne*, 130 Fed. App'x. at 661, n. 3. The Court finds this earlier part of *Payne* more applicable than the later portions of that opinion Defendants' cite in support of their motion. The summary judgment evidence conclusively establishes that Moreno was a third-party under *Steagald*, not an evading suspect under *Payton*, and therefore whatever hot pursuit argument can be made must be attributable to the search for Jaime Sanchez.

While Defendants argue in their motion that there was a hot pursuit exigency justifying the warrantless search, the evidence belies that argument. First, the evidence quite convincingly establishes that there was no "immediate or

---

[26] The second officer in *Payne* heard over the radio that the initial officer was in hot pursuit of the defendant and overheard the first officer announcing the address of the suspect. 130 Fed. App'x. at 658. The second officer then arrived at *Payne*'s mother's home and took part in a search of his mother's home without her consent assuming that the first officer actually had been in hot pursuit. *Ibid.* The problem arose in Payne when the plaintiff there alleged that there had been no hot pursuit and that the police officer had simply arrived at his mother's home demanding admittance. *See generally, ibid.* In addition, the Fifth Circuit Court of Appeals made it clear that the officer's version of events had many inconsistencies. *Ibid* at 661. Taken together, these warring versions of the hot pursuit precluded summary judgment on qualified immunity grounds in the initial officer's favor. *Ibid* at 662.

continuous pursuit of the [suspect] from the scene of a crime." *Welsh*, 477 U.S. 740
(1984). Ensuring not to demand too exacting of a hot pursuit definition, the Court
has extensively reviewed the record. No one was being chased. No one saw the
suspect run into Moreno's home.[27] One of the first responders testified that he and
other officers were "not in hot pursuit." See Dep. Test. of Lt. Raul Rodriguez at 30-35.
(Docket No. 87, Ex. E). Pursuing leads of a suspect's location is not the same as
pursuing the suspect. To rule in Defendants' favor as to this claim would in effect
turn every police investigation into a hot pursuit. The Court respectfully declines
such an invitation and rules that at the very least there is a genuine issue of
material fact as to whether officers where in hot pursuit of Sanchez.

### 2. *Emergency Aid Exigency*

Defendants' next justification is that they forcibly entered Moreno's home for
his own good. The argument appears to be that because the police were looking for
a violent criminal; the police received a non-collaborated anonymous tip that the
suspect was in Moreno's home; and that because Moreno did not respond to their
requests Moscorro "made the decision to break the door down to check on [Moreno's]
safety." Dep. Test. of Lt. Adrian Mascorro. (Docket No. 87, Ex. A). There are
several problems with this proposed justification.

First, there are at least two reports, one from Defendants' own expert
witness[28] and another from the first-responding officer,[29] that establish that Moreno
was perfectly fine when the police arrived. Defendants' own evidence demonstrates
that Moreno was able to walk, use his limbs, and did not appear injured in any way.
In both versions Moreno is quietly sitting on a couch notwithstanding officers
pounding on his windows and door. Because Moreno was sitting quietly and

---

[27] "Q: As far as you know did any of the police officers see a suspect run into the house? A: As far as we know – that I know, no." Dep. Test. of Ofr. Viviana Trevino at 42-43. (Docket No. 85, Ex. A).

[28] According to Defendants' expert witness, "the officers looked through the screened front door and observed a male subject, later identified as Ricardo Moreno. Moreno was observed sitting next to the front door in the living area of on the couch. As the officers walked up to the front door, Moreno stood up, closed the door, and locked it." Aff. of Defs.' Expert Cdr. Albert Rodriguez at 6. (Docket No. 85, Ex. M).

[29] According to the first responding officer Moreno was sitting on his front porch as the officer arrived and while the officer was still in his patrol unit, Moreno rose and walked into his home, closing and locking the door behind him. Dep. Test. at 30 Sgt. R.D. Jesse (Docket No. 85, Ex. J).

unresponsively on his couch, BPD officers argue they had exigent circumstances to rush to Moreno's aid.

Defendants' motion possesses no authority on this particular subject. Presumably, Defendants are relying on the emergency aid doctrine as expounded by the Supreme Court in *Brigham City, Utah v. Stuart*, 547 U.S. 398, 406 (2006). When the Brigham City Police Department approached the house in question they could hear:

> from within "an altercation occurring, some kind of a fight." . . . ."It was loud and it was tumultuous." . . . . The officers heard "thumping and crashing" and people yelling "stop, stop" and "get off me." . . . . As the trial court found, "it was obvious that ... knocking on the front door" would have been futile. . . . The noise seemed to be coming from the back of the house; after looking in the front window and seeing nothing, the officers proceeded around back to investigate further. They found two juveniles drinking beer in the backyard. From there, they could see that a fracas was taking place inside the kitchen. A juvenile, fists clenched, was being held back by several adults. As the officers watch, he breaks free and strikes one of the adults in the face, sending the adult to the sink spitting blood.

*Brigham City*, 547 U.S. at 406. This case is different. To be sure, because the determination of the existence of exigent circumstances "is essentially a factual determination, there is no set formula for determining when exigent circumstances may justify a warrantless entry." *United States v. Troop*, 514 F.3d 405, 409 (5th Cir. 2008). But in "this case, there was no evidence of medical distress requiring immediate aid, such as loss of blood, signs of physical illness, or evidence that an individual had been carried or dragged." *United States v. Troop*, 514 F.3d 405 (5th Cir. 2008). Moreno was an elderly man sitting on his couch late in the evening.

Defendants make much of the fact, as they allege it at least, that Moreno was unresponsive.[30] But in *Troop*, like here, law enforcement arrived at the scene of

---

[30] *See* Dep. Test. of Lt. Adrian Mascorro at 16. (Docket No. 87, Ex. A) ("I didn't know who it was at the time. I thought somebody was hurt. He wasn't moving. We were, you know, yelling at him,

suspected criminal activity, announced themselves as law enforcement officers and repeatedly knocked. *Troop*, 514 F.3d at 408. In *Troop,* law enforcement officers then began walking around the house until they came to a window where they could see some of the occupants. *Ibid.* They began shouting at the occupants and shining flashlights at them; the occupants were unresponsive even after one of the officers shook one of their limbs. *Ibid.* The Fifth Circuit Court of Appeals did not hesitate to state that "without any objective evidence of physical distress, the failure of anyone to respond to the agents' knocking at the front and back doors of Troop's house also becomes insufficient to create exigent circumstances." *Ibid.*

It is clear that BPD officers were attempting a "knock and talk" strategy that is permitted under Fifth Circuit precedent. *Ibid.* A knock and talk strategy is a "reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity." *Troop*, 514 F.3d at 410. However, the Fifth Circuit ruled as early as 2007 that when no one answers the door, the officers should end the knock and talk and "change[...] their strategy by retreating cautiously, seeking a search warrant, or conducting further surveillance." *United States v. Gomez-Moreno*, 514 F.3d 405, 410 (5th Cir. 2007). It was not reasonable to assume that Moreno needed immediate medical attention based on his failure to respond to the officers' knocks and calls.

### 3. Aiding and Abetting "Exigency"

Defendants' next justification is that they reasonably believed that Moreno was in effect aiding and abetting a fugitive. *See* Defs.' Mot. at 32 ("he could be harboring the suspect or being held hostage"). Police officers surrounded the home and heard footsteps, which again —in the light most favorable to Plaintiffs— were of Moreno's own making. These footsteps along with the claims of an unidentified, anonymous, and quite likely intoxicated individual, that Sanchez had entered Moreno's home, is all of the evidence that singled out Moreno's home from any of the many in the area. By this logic, every time a crime is committed in a

---

knocking, and so I decided that because his welfare —not— you know, looking for the suspect took secondary, so now it was more like a welfare concern on the person").

neighborhood a neighbor may call and accuse another neighbor of harboring the suspect.   Once the accusation is made, the police may show up, hear some unidentified footsteps, and enter. The Fourth Amendment demands more.

The Fourth Amendment demanded on November 11, 2008, that officers may attempt to knock and talk. *Troop*, 514 F.3d at 409. The police officers here did try to knock and talk and the Court takes no issue with that practice as it is clearly permissible. *Ibid.* The Fourth Amendment issue arose when officers did not elicit the optimal response as far as they were concerned: Moreno's consent to search his home.   The appropriate and lawful response was not to proceed to break into Moreno's home without a warrant.   Police officers should have retreated, as they eventually did after unlawfully entering the home, and then continued surveillance or obtained a warrant. *Troop*, 514 F.3d at 410.

The argument that Moreno "was protecting and helping the suspect" is to no avail. See Defs.' Mot. at 31 (Docket No. 85) ("Not knowing if the person was the suspect, was being held by the suspect, had been injured by the suspect, was protecting the suspect, and given that he was not acknowledging the attempts by the police at communications . . . the decision was made to enter). First, there is no evidence —even looking as an objectively reasonable police officer would have known the information then— that Moreno was an accomplice.   Second, even if Moreno was an accomplice —which he was not— the Fourth Amendment demanded either the procurement of a warrant or further surveillance aimed at garnering more information to either obtain a warrant or perhaps catch the suspect as he emerged from Moreno's home. *Ibid.*

To be sure, there were sufficient officers on hand that day to "establish a perimeter" and to go get a warrant.[31]   And in fact, officers did surround Moreno's home covering every possible exit.   Moreover, the unreasonable notion that

---

[31]"Then what happened, the cops all go out, right, they stay there, then more cops are coming in and even regular cars and park – Q: Where are they [the police], in the front, in the yard . . . No, they were outside the yard and – but now they're inside the yard, they're outside the yard, they're in the street. By this time they're almost everywhere. Now more cops are coming in . . . And then even more cops started arriving after that and then . . ." Dep. Test. of Fernando Fernandez at 29. (Docket No. 85, Ex. L).

Moreno's complicity in hiding Sanchez is an exigent circumstance is simply incorrect.   An individual concealing a suspect is not an exigent circumstance; instead it is a situation in which police officers need a warrant or an exigent circumstance to enter the suspected accomplice's home.   One person hiding another is not an exigency that allows the police to enter a home without either a search warrant or an arrest warrant. *Steagald*, 451 U.S. 204 (1981).

### 4. The Hostage "Exigency"

Defendants finally argue that they reasonably believed that Moreno was a hostage.   There is absolutely no evidence in the record that would objectively lead any reasonable police officer to conclude that Moreno was a hostage.   Although police accounts vary considerably,[32] it is clear that Moreno was ambulatory and acting of his own free will.   It borders on the absurd to argue, even from the circumstances known then, that Moreno was the hostage of someone that was never seen entering the home and was never seen afterward—notwithstanding the small home being surrounded by a horde of police officers.

In closing Defendants offer up one ephemeral possibility after another in an attempt to justify their presumptively unreasonable and warrantless entry into Moreno's home.   The simple multiplicity of all these   —in some instances mutually exclusive— exigent circumstances make it clear that the organizational structure that a police department should have in responding to claims such as the present one broke down on November 11, 2008.   Nevertheless, even if the Court takes each officer, and assumes that each believed their unreasonable actions to be reasonable in light of warring justifications for entry, objectively speaking no officer on that scene had an objectively reasonable belief that initially entering that home was lawful.   Exigent circumstances are not created by the theoretical possibility of exigent circumstances being present within a home.   The Fourth Amendment demands more and it is clear that as far as that initial entry was concerned, the officers involved fell quite short of what the Constitution required.

### b. The Hole-Piercing of Door

---

[32] *Compare supra*, n.26, *with supra*, n.27.

After the warrantless entry in the absence of exigent circumstances discussed above, Defendant Rodriguez, and his subordinates, was by all accounts less-than-politely ushered out by Moreno. BPD insisted that Moreno communicate with them although he had no obligation whatsoever to so do. *Troop*, 514 F.3d at 408. When BPD officers initially entered as discussed above, they broke the bottom portion of the door. As they stood outside calling for Moreno's cooperation they decided to "continue[...] trying to break more of the door down for two reasons; one is to have better communications – face-to-face—communications or more direct communication, and the other is also to try to convince him to drop the knife." Dep. Test. of Lt. Adrian Mascorro at 22. (Docket No. 85, Ex. L). If Moreno had no obligation to speak to the police when they first arrived, *see Trooper*, 514 F.3d at 408, under Plaintiffs' version of the facts it is not exactly clear what obligation he possessed to cooperate with the police after their unlawful entry into his home and subsequent exit.

The piercing of holes through the door was a search. First, the testimony of Defendants' own expert witness demonstrates a clear subjective expectation of privacy. Defendants' expert witness has testified that:

> [BPD officers] approached the reported resident of 1634 East Van Buren, which was located behind Juan's Mechanic Shop. The officers looked through the screened front door and observed a mal subject, later identified as Ricardo Moreno. Moreno was observed sitting next to the front door in the living area on a couch. As the officers walked up to the front door; Moreno stood up, closed the door, and locked it.

Aff. of Defs.' Expert Cdr. Albert Rodriguez at 6. (Docket No. 85, Ex. M). Assuming the jury believes even Defendants' version of events, Defendants expert's testimony would show a clear subjective expectation of privacy. *United States v. Kye Soo Lee*, 898 F.2d 1034, 1037 (5th Cir.1990)). The only remaining issue would be whether that expectation was one that society is willing to recognize as reasonable. *Kye Soo Lee*, 898 F.2d at 1037-38.

The Supreme Court made it clear that the Fourth Amendment draws "a firm line at the entrance to the house." *Kyllo v. United States*, 533 U.S. 27, 40 (2001) (citing *Payton*, 445 U.S., at 590, 100 S.Ct. 1371." That line is "not only firm but also bright . . . ." *Ibid.* Few actions in our society evince a desire more for privacy than a closed door. To explore details, through surveillance, of Moreno's home that would have been previously unknown without a physical intrusion was a search. *Kyllo*, 533 U.S. at 40. Had BPD officers used a thermo-vision apparatus by pointing it at Moreno's home it would have been a search. *Ibid.* It is difficult to conceive that the Supreme Court in *Kyllo* denied officers the ability to use thermo-vision devices to learn facts of the interior of the home without a warrant, but would have allowed those officers to approach Kyllo's home, pierce holes through the door, and use their naked eyes to view the inside of Kyllo's home. The Court is quite confident that clearly established Supreme Court precedent foreclosed piercing holes in a home's door. The Court will therefore conclude that the Plaintiff-supplied version of events, and likely the Defendants' version as well, establish that piercing holes through a home's door was a search of the home. ." *Kyllo v. United States*, 533 U.S. at 40. A home search is presumptively unreasonable unless conducted with a warrant or exigent circumstances. *Payton*, 445 U.S. at 586. Defendants concede that they possessed no warrant and largely ignore this specific unlawful search in their Motion. Nevertheless, to the extent that Defendants argue exigent circumstances, the Court rejects the existence of that exigency in regard to this second search with the same fervor that it rejected it in regard to the unlawful entry.

c. The Second Entry

Aside from the initial first entry, the undisputed facts are that two different groups of SWAT team members simultaneously reentered Moreno's home without a warrant. Defendants argue that because Moreno had committed aggravated assault against them earlier that they now had an independent basis to enter the home and arrest him. But whether Moreno unjustifiably assaulted the initial unlawful enterers with a knife is a fact question. A fact question that is in dispute

25

and that would have an incredible bearing on the objective reasonableness of entering the home anew. If a jury finds that Moreno possessed no knife, BPD's reentry becomes objectively indefensible.[33]

### d. The Unlawful Execution of the Searches

Plaintiffs are suing Defendants not only for the warrantless entries but also for violating the proscribed constitutional requirements concerning the execution of those entries and the force employed in executing the allegedly valid constitutional searches.[34] Specifically, assuming Defendants had a valid legal justification to initially enter —which they did not— the manner in which the execution of that search and seizure was carried out violated the Fourth Amendment according to Plaintiffs. Defendants largely miss this point in their Motion for Summary Judgment.

Even law enforcement officers that have a good faith and reasonable belief in the constitutional validity of a search may nonetheless incur liability under 42 U.S.C. § 1983, if the search is executed in an unreasonable manner. *See Duncan v. Barnes*, 592 F.2d 1336 (5th Cir. 1979) (ruling that officers that had a good faith and reasonable belief in executing a warrant was not determinative of the genuine issue of material fact as to whether officers had executed the warrant in a manner that was free of malicious, arbitrary or capricious motives). Here a reasonable jury could conclude that the officers involved in the execution of these searches were malicious, arbitrary or capricious.

---

[33] By the time SWAT entered the home a second time —objectively speaking— the Court is rather confident BPD realized no one else was in the home. Defendants' claim that "at the time the decision was made to try to bring Mr. Moreno out of the house, the tactical team was still operating under the impression that there was a second person in the house (the stabbing suspect Jaime Sanchez), and they still did not know if Mr. Moreno was injured, under duress, or aiding and abetting the stabbing suspect" is simply incredible. Defs.' Mot. at 33 (Docket No. 85). More than ample evidence exists in the record that shows that Moreno was not hurt, was not being held hostage, and was not aiding Sanchez. The second entry is even less objectively reasonable in the absence of a law enforcement purpose aimed specifically against Moreno.

[34] Plaintiffs' complaint gives ample notice of this claim. *See* Compl. at 6-8 (Docket No. 54) ("These actions [after detailing several of them] constitute excessive force in making a warrantless entry into Mr. Moreno's premise and arrest of Mr. Moreno without probable cause."). Here it is plain that the warrantless entry is not itself the dispute of this claim, but that the *manner* in which the warrantless entries were made are also grounds independent liability grounds.").

The Fifth Circuit made it clear in *Duncan* that "the siege of appellants' apartment was subject to scrutiny under the fourth amendment." *Duncan*, 592 F.2d at 1136. Here under even the most liberal of definitions, BPD laid siege to Moreno's home. While Defendants characterize this as a due process claim in their Motion, in actuality, the reasonableness of the execution of the warrant is a Fourth Amendment claim. *Ibid.*

Plaintiffs have produced substantial evidence in opposing Defendants' motion that could lead a reasonable jury to conclude that the searches involved here were executed in an unreasonable manner. First, there is evidence that the officers did not identify themselves. Dep. Test. of Gerald Z. Salazar at 6 (Docket No. 85, Ex. N). Second, there is evidence that the officers did not heed warnings from neighbors as to Moreno's mental state.[35] Third, there is evidence that an incredibly large police force was deployed.[36] Fourth, there is evidence that all but three officers of the entire SWAT team for the BPD was employed.[37] Fifth, after BPD learned that they could be mistaken as to the propriety of targeting Moreno's home, they persisted. Sixth, the SWAT team Bearcat Armored Transport was called to the scene and used to communicate with Moreno. Seventh, BPD officers broke Moreno's door as well as pierced holes in it. Eighth, BPD officers broke almost all of Moreno's windows and turned off his utlities. Ninth, Moreno was shot 16 times, nine times with non-lethal rounds and seven times with lethal rounds. From "the moment of entry until the moment of departure, police officer conduct is subject to scrutiny for reasonableness under the Fourth Amendment." *Duncan*, 592 F.2d at 1336. In light of all of the evidence above, the Court is confident that a reasonable jury could find in Plaintiffs' favor as to this ground.

e.  The Unlawful Excessive Force

The Fifth Circuit Court of Appeals has established a three-part test to determine a claim of excessive force: "an injury, which resulted directly and only

---

[35] *See supra*, n.6.
[36] *See supra*, n.11.
[37] *See supra*, n.16.

from the use of force that was clearly excessive to the need; and the excessiveness of which was objectively unreasonable." *United States v. Sipe*, 388 F.3d 471, 480 n.22 (5th Cir. 2004). It is not disputed that Moreno died as a result of injuries produced solely by BPD officers. Although many outstanding factual determinations remain to be made that will help the Court in subsequent stages of these proceedings, not one is more central than whether Moreno possessed a knife at any time or even at the time that he was fatally shot.

The only witnesses to the existence of the knife are the officers involved in shooting him and Moreno. Moreno was killed, leaving the officers as the only visual witnesses. The Court, again, having reviewed the evidence extensively finds that a genuine issue of material fact exists as to whether a knife existed at every stage the police allege it justified their seemingly unreasonable behavior. First, taking the police officer's versions of events as true, diametrically opposed to the Court's present duty, many officers saw the knife at one point or another, but a consensus as to its characteristics is non-existent. Second, for the officers that were in the room when the knife was being allegedly wielded at them, the knife would have been a focal point on which the eyes remained at all times, yet the extensive record does not evince a standard answer of what the knife looked like. Third, after all of these events someone would have had to pick up the knife and the SWAT team members in the room when Moreno was shot would have seen him drop the knife. Fourth, SWAT team members have testified that Moreno put down the knife on at least two occasions. Notwithstanding that so many officers saw this knife, on more than one occasion, over a period of several hours, no collective description of the knife exists. Finally, the only witness that was around other than Moreno, or an officer, was Moreno's neighbor whose testimony is that SWAT ran into the room and yelled at Moreno several times to get down and then shot him. Dep. Test. of Gerald Z. Salazar at 33. (Docket No. 85, Ex. N). Moreno's neighbor's testimony does not include any of the commands that Defendants' claim they made concerning the knife. A reasonable jury could conclude that Moreno did not possess a knife. If

Moreno did not possess a knife the use of force employed herein was objectively unreasonable.

    f.  <u>Duty to Intervene</u>

       That a constitutional deprivation "has occurred at the hands of a state actor, however, does not answer the separate question of which other persons, apart from the immediate perpetrator, may be held liable under § 1983." *Doe v. RCISD*, 66 F.3d 1402, 1407 (5th Cir. 1995). Nevertheless, § 1983 does not provide for any form of vicarious or respondent superior liability. *Estate of Davis v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir.2005); *Reyes v. Bridgewater*, 362 Fed. App'x. 409 (2010) (unpublished). Instead this type of liability is proper when "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Ibid.*

       In this regard, this is a rather unique case on several fronts. First, neither party disputes that whatever occurred here transpired over the course of several hours, not seconds or minutes. *See e.g., Reyes*, 362 Fed. App'x. at 409 ("less than two minutes transpired between [supervisor's] arrival and the shooting"). Second, usually the supervisor sued was not at the scene. *See e.g., Brown v. Callahan*, 623 F.3d 249 (2010) (Sheriff had no knowledge of incident); *see also, Dilworth v. Box*, 53 F.3d 1281 (5th Cir. 1995) (off-scene supervisor was not liable even if negligent in following up reports of jail abuse). Third, that the supervisor was unaware of the challenged actions of his subordinates. *See e.g., Kohler v. Englade*, 470 F.3d 1104, 1115 (5th Cir. 2006) (Chief was not personally involved in investigation, procurement, or execution of warrant and therefore could not be held liable); *see also, Thompson v. Upshur County, Tex.*, 245 F.3d 447, 459 (5th Cir. 2001).

       The supervisors sued herein were all physically present at the location of the incident over the course of several hours, were personally briefed before actions were taken, and were personally involved albeit in different in capacities. Mascorro participated not only in the decision to initially enter the home but also in the entry

itself. In fact, he openly admits that he played a personal role in knocking down Moreno's door and entered the home personally. Mascorro also openly admits to personally piercing holes through the door himself. Mascorro also stood by as officers aided and abetted him in these unlawful enterprises. Rodriguez personally participated not only in the decision to initially enter the home,[38] in the surrounding of the home, but in the entry itself.[39]

The Fifth Circuit Court of Appeals has long held that a supervisor who is "*not personally involved*" in constitutionally challenged acts may not be held liable under § 1983 unless: 1) the supervisor failed to train or supervise the officers involved; 2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and 3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights. *Thompson*, 245 F.3d at 458 (emphasis added).

When a plaintiff sues a police chief, or any supervisor for that matter, a plaintiff must "show either that the police chief was *personally involved* in the constitutional violation or that there is a sufficient causal connection between the police chief's conduct and the constitutional violation." *Kholer v. Englade*, 470 F.3d 1104, 1115 (5th Cir. 2006) (emphasis added); *see also, Dilworth v. Box*, 53 F.3d 1281 (5th Cir. 1995) (supervisor may be liable if he or she is personally involved); *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987) (same); *Davis v. Stalder*, 51

---

[38] One key line of Rodriguez's testimony shows just how constitutionally misguided and unreasonable his decision-making on November 11, 2008, truly was. See Dep. Test. of Lt. Raul Rodriguez. (Docket No. 87, Ex. E) ("So when you hear the noise, when you hear footsteps, you don't have anything that leads you to believe that it's not Mr. Moreno? . . . We don't have anything to lead us to believe that it's not him. . . . So it could be Mr. Moreno? . . . It could be someone else. . . . Okay so really, that's not an indication that there's somebody else in the house? . . . It's certainly not an indication that there isn't someone else."). Rodriguez seems to have made the decision that probable cause existed to enter the home because there was no evidence that probable cause did not exist. By Rodriguez's interpretation every nearby homeowner would have to establish, to Rodriguez's satisfaction, that probable cause did not exist to enter the respective home or else Rodriguez would have probable cause to enter that homeowner's home. This, by itself, objectively unreasonable.

[39] This presents yet another genuine issue of material fact. According to Rodriguez, and contradicted by several others, no one actually entered the home upon the first entry. See Dep. Test. of Lt. Raul Rodriguez. (Docket No. 87, Ex. E) ("And they break the door down? . . . Correct . . . Okay. Do they go inside the house? . . . No, sir. . . . Where do they go? . . . Right at the door, right at the threshold of the door. . . . Okay. They make it into the doorway? . . . Not into the doorway. Right at —right at the threshold of the door. It was [his subordinates] Officer Cavazos, Officer Rico, and myself.").

F.3d 1043 (5th Cir. 1995) (unpublished) (same).  The emphasized portion of these quotes forms much of the present inquiry.

The inquiry of course, is the appropriate definition of the phrase "personally involved" given that "the personal involvement by a defendant 'is an essential element of a civil rights cause of action.' " *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983).  The Fifth Circuit Court of Appeals does not appear to have ever defined the term. The Second Court of Appeals has, however, defined the term.

A police officer is "personally involved" in a constitutional violation if he or she either: (1) "directly participates," defined as the "intentional participation in the conduct constituting a violation of the victim's rights by one who knew the facts rendering it illegal, or (2) fails "to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Biggs v. City of New York*, 2010 WL 462 8360 (S.D. N.Y. 2010) (citing *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir.2001); *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir.1994)).   As to this second form of personal involvement the *Anderson* court noted that it is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence. *Anderson*, 17 F.3d at 557 (2nd Cir. 1994) (citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir.1988); *Webb v. Hiykel*, 713 F.2d 405, 408 (8th Cir.1983); *Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir.1982), cert. denied, 459 U.S. 1171, 103 S.Ct. 816, 74 L.Ed.2d 1014 (1983); *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir.1972)).

The Complaint makes it clear that this is exactly the type of claim that Chief Garcia is being sued for.  Specifically, "Chief of Police Carlos Garcia was at the scene during some portion of the incident and failed to stop the illegal action of the police." First Amend. Compl. at 9. (Docket No. 54). For their part, Defendants do not contest that the Chief of Police was there and "observed the situation." Defs.' Mot. at 13. (Docket No. 85). Defendants have also provided evidence that the Chief of Police was aware of the events unfolding before him.  Nevertheless, they aver that because "Chief Garcia never makes entry into the home" that "he cannot be

liable for excessive force." *Ibid.* This is statement of the law is just not accurate. The Fifth Circuit has specifically held that an officer who is *present at the scene* and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983. *Hale v. Townley,* 45 F.3d 914, 919 (5th Cir. 1999) (emphasis added). It is incredibly hard for the Court to believe that if Chief Garcia would have disagreed with the plan that it would have nevertheless been carried out given that Paschall was Garcia's subordinate. Defendants miss the true and perfectly clear claim in the complaint: Garcia's failure to intervene. Defendants' own motion states that "Although he [Garcia] was present when Lt. Paschall was consulted about the plan to enter, and agreed with it, it was Lt. Paschall's call as Commander of the team." (Docket No. 85 at 50).

The Court finds therefore that Garcia was personally involved given that he was at the scene while discussion was being had about how to best execute the search and the arrest of inhabitants within and either expressly or tacitly agreed to the methods that were ultimately employed. Plaintiffs' have provided ample evidence, that Defendants do not dispute, that Garcia had ample opportunity and authority to intervene. The number of "unconstitutional events" that transpired with Garcia's personal involvement is a question that cannot be settled on a disputed factual record and a presently unsettled sequence of events. Likewise, it is a fact question whether Garcia actually had the opportunity to intervene and failed to do so with deliberate indifference. The Court feels confident nevertheless in finding that at this juncture, Plaintiffs have done enough to show that Garcia was personally involved in the alleged events of November 11, 2008.

For the same reasons the Court finds that Lt. Paschall was personally involved in the events of November 11, 2008.[40] Like Chief Garcia, Lieutenant Paschall, clearly the second-in-command on the scene, apparently "did not come up

---

[40] Although there is also evidence that Paschall participated directly in the second entry by entering the home. See Aff. of Cdr. James Paschall. (Docket No. 85, Ex. D) ("Several minutes after the arrest teams made entry into the residence, I made entry into the residence to observe the tactical team members but I did not participate in any manner in the tactical team officers' attempts to arrest the suspect.").

with the plan on how to enter the home or try to extract Mr. Moreno so that they could either arrest the stabbing suspect or clear the house, but he was consulted and agreed with the plan." (Docket No. 85). Defendants contradict themselves in the very next paragraph of the Motion for Summary Judgment when they claim that Garcia is not liable because "it was Lt. Paschall's call as Commander of the team." *Ibid.* Again, according to Plaintiffs' version of the facts, Paschall had a duty to intervene in the unconstitutional events transpiring before his eyes instead of becoming personally involved in planning and execution of the plan itself. It is a fact question whether Paschall actually had the opportunity to intervene and failed to do so with deliberate indifference. The Court feels confident nevertheless in finding that at this juncture, Plaintiffs have done enough to show that Paschall was personally involved in the alleged events of November 11, 2008.

According to Defendants, Sgt. Arnold, not Commander Paschall or the Chief of Police, was the architect and executioner of the plan being constitutionally challenged. This inference is a fair one given that Defendants agree that a plan was concocted by someone and the chain of command that day went from Garcia to Paschall to Arnold. In addition, SWAT team members have testified that their squad leader, Arnold, was the one that got to ask questions and they, the SWAT team members, generally just carry out commands and don't create plans. Defendants' motion largely ignores this reality and focuses instead on the Arnold's justification for shooting Moreno.

Again, here Defendants miss Plaintiffs' clear arguments. The argument is not that Arnold acted in an objectionably unreasonable manner vis-à-vis Moreno — at least not as to this claim— but that the plan to enter and the manner in which it was executed, something that Defendants indirectly put on Arnold's shoulders, was a violation of Moreno's constitutional rights. The Court finds that neither party disputes that Arnold was a decision-maker when it came to the plan. If the plan was unconstitutionally carried out or unconstitutionally initiated then Arnold will be liable not because of any notion of respondeat superior but because of his

personal involvement in being the plan's architect or his failure to intervene in the unconstitutional behavior of his subordinates.

## II
## FIFTH AMENDMENT VIOLATIONS

### a. Procedural Due Process

Plaintiffs may not prevail on their procedural due process claim unless decedent had a liberty or property interest that was abridged. *Wilson v. First Gibraltar Bank, F S B, Arlington, Tex.*, 22 F.3d 1095 (5th Cir. 1994). The record clearly establishes evidence that could lead a reasonable jury to conclude that Moreno's property and liberty interests were unlawfully abridged in violation of the Fourth Amendment. More specifically, the record contains evidence that officers perhaps deprived Moreno of his liberty, his life, and several property interests through the incident subject to challenge in the present case without due process of law.

### b. Substantive Due Process

The evidence that a jury would likely hear concerning this substantive due process claim is properly analyzed under the Fourth Amendment's objective reasonableness standard both of the belief of right-of-entry, the amount of force employed, and the manner in which the search was conducted. *See Graham v. Conner*, 490 U.S. 386, 109 S.Ct. 1865 (1998). Plaintiffs cannot argue a substantive due process claim when the claim is basically an exact recasting of right explicitly protected by the text of the Constitution. *See Lindquist v. City of Pasadena, Tex.*, 525 F.3d 383 (5th Cir. 2008) (citing *see County of Sacramento v. Lewis*, 523 U.S. 833, 842, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) ("[W]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.")). Therefore this claim must be dismissed as a matter of law.

## III

## FOURTEENTH AMENDMENT VIOLATIONS

In the first count of the Complaint, Plaintiffs argue at times directly and at other times indirectly, that Moreno was discriminated against because he was a poor, elderly and disabled man. First Amend. Compl. at 9-10. (Docket No. 54). When ruling on Defendants' motion to dismiss the Court made it clear that there were no allegations that would support any such Fourteenth Amendment claim:

> The plaintiffs have not alleged facts that would indicate that Ricardo Moreno was singled out for disparate treatment based on his alleged mental disability. If anything the complaint indicates the opposite; the police officers refused to acknowledge, through their conduct and decisions, that Ricardo Moreno possessed a mental disease or defect.

Mem. Op. at 16 (Docket No. 59). On the eve of the trial the Court's position remains the same notwithstanding the voluminous amount of discovery in this action. There are no genuine issues of material facts here and a reasonable jury could not conclude, based on the evidence, that Moreno was discriminated against based on his age, mental status, or wealth. Because the evidence does not establish any of these claims it is unnecessary to undergo any further analysis as to the propriety of whether any of those classes are suspect classifications. The evidence simply is not there.

Moreover, as to the class-of-one equal protection that remained viable even after the Court dismissed the traditional equal protection claim in its earlier order and opinion, that claim too must meet its sunset. The evidence cannot reasonably show that police singled Moreno out for law enforcement based on personal animus. Moreover, there is no evidence of how police officers treated others similarly situated. Therefore, this claim must also be dismissed.

## IV. STATE CLAIMS

Plaintiffs initiated this action alleging that Dispatcher Villarreal and the Officer-Defendants were both liable for negligence under state law in their official and individual capacities. First Amend. Compl. at 2-3 (Docket No. 54). In addition,

Plaintiffs alleged that the officers should be officially and individually held liable for the intentional tort of assault in addition to common law negligence. *Ibid* at 16-17. In their Motion to Dismiss Defendants raised several issues as to Plaintiffs' ability to maintain an action both against the officers in their official capacity, in regard to the tort claims, as well as the City. Plaintiffs agreed that they could not maintain an action both against the City and the individual defendants in their official capacity. In light of this agreement as to the law, the Court memorialized that agreement in an earlier opinion. Mem. Op. at 4-5 (Docket No. 59). The Court made it clear that the tort claims against the defendants in their individual capacities remained viable at that time. *Ibid* at 5 ("Nevertheless, the plaintiffs wish to continue these claims against the officers in their individual capacit[ies]").

Presumably aware of this admonishment, Defendants went to great lengths in their motion for summary judgment to explain why the tort claims were no longer viable against the individual officers or the City. Defs.' Mot. at 36-41 (Docket No. 85). Plaintiffs' response completely overlooked Defendants' claims of the non-viability of these claims. The Court held a summary judgment hearing in which Defendants questioned Plaintiffs' failure to address Defendants' claims as to the state claims. Counsel for Plaintiffs responded that:

> As to the complaints about [the failure to respond] – the argument about the Texas Tort Claims Act, in our response to the 12(b)(6) motion for summary judgment, we stated Plaintiffs have reviewed the Defendants' motion to dismiss regarding the 6th Amendment, Texas Tort Claims Act, Federal Tort Claims Act. We agree with the arguments of Defendants' and submit that those are not issues.

Mot. Hr'g Tr. at 42. (Docket No. 89). The Court finds Defendants' arguments of abandonment convincing. Nevertheless, even if the claims have not been abandoned, the Court finds that all Defendants are entitled to summary judgment in their favor based on all the state-law theories here presented.

Sovereign immunity "and its counterpart, governmental immunity, exist to protect the State and its political subdivisions from lawsuits and liability for money

damages." *See Mission Consol. Independent School Dist. v. Garcia*, 253 S.W.3d 653 (2008) (citing *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006). The Supreme Court of Texas has stated that such suits "hamper governmental functions by requiring tax resources to be used for defending lawsuits and paying judgments rather than using those resources for their intended purposes." *Ibid* at 655 (citing *Tex. Natural Res. Conservation Comm'n v. IT–Davy*, 74 S.W.3d 849, 854 (Tex. 2002)). In 2003, Texas took part in a "comprehensive effort to reform the tort system." *Ibid* at 656.

As part of that comprehensive effort the Texas Legislature amended Section 101.106 of the Texas Civil Practice and Remedies Code. Tex. Civ. Prac. & Rem. Code § 101.106. That section, entitled "Election of Remedies," now provides:

> (a) The filing of a suit under this chapter against a governmental unit constitutes an irrevocable election by the plaintiff and immediately and forever bars any suit or recovery by the plaintiff against any individual employee of the governmental unit regarding the same subject matter.
>
> (b) The filing of a suit against any employee of a governmental unit constitutes an irrevocable election by the plaintiff and immediately and forever bars any suit or recovery by the plaintiff against the governmental unit regarding the same subject matter unless the governmental unit consents.
>
> (c) The settlement of a claim arising under this chapter shall immediately and forever bar the claimant from any suit or recovery from any employee of the same governmental unit regarding the same subject matter.
>
> (d) A judgment against an employee of a governmental unit shall immediately and forever bar the party obtaining the judgment from any suit against or recovery from the governmental unit.
>
> (e) If a suit is filed under this chapter against both a governmental unit and any of its employees, the

employees shall immediately be dismissed on the filing of a motion by the governmental unit.

(f) If a suit is filed against an employee of a governmental unit based on conduct within the general scope of that employee's employment and if it could have been brought under this chapter against the governmental unit, the suit is considered to be against the employee in the employee's official capacity only. On the employee's motion, the suit against the employee shall be dismissed unless the plaintiff files amended pleadings dismissing the employee and naming the governmental unit as defendant on or before the 30th day after the date the motion is filed.

Tex. Civ. Prac. & Rem. Code § 101.106. Neither party disputes that the police officers and the police dispatcher involved in this case were employees of the Brownsville Police Department. Neither party disputes that the police officers and the police dispatcher involved in this case were acting within the general scope of their respective employments. Section 101.101(e) appears to control this case given its particular characteristics. Section 101.101(e) makes it clear that when "a suit is filed under this chapter against both a governmental unit and any of its employee, the employees shall immediately be dismissed on the filing of a motion by the governmental unit." *Ibid.* The governmental unit, the City in this case, has so filed. Defs.' Mot. at 1. (Docket No. 85). Moreover, it is undisputed that all the individual employees in this case were acting within the general scope of their respective employment. This finding binds the Court to undertake only official capacity-based liability on the part of the individual defendants. Tex. Civ. Prac. & Rem. Code § 101.101(e). Therefore, even if the City had not so moved to dismiss the individual defendants, the individual defendants have moved to dismiss themselves from this suit in their own right under Texas law. Tex. Civ. Prac. & Rem. Code § 101.106(f); *see also, Garcia*, 253 S.W.3d at 659 ("The ISD has not sought [individual defendant's] dismissal, however, and [individual defendant] has not sought his own dismissal under subsection (f)") Texas law is clear that tort-based claims against the individual defendants must be dismissed as a matter of law. *Ibid.*

The same is true for the specific tort-based claims alleged in this case against the City. The common law intentional torts of assault, false imprisonment, and false arrest are barred from litigation against Texas governmental units pursuant to Tex. Civ. Prac. Rem. Code § 101.057.[41]

Although negligent tort claims do not suffer from the same prophylactic ban as intentional tort claims, the character of the negligence claim involved must fit a very narrow exception. Specifically, § 101.021 of the Tort Claims Act provides that a governmental entity is liable for:

> (1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:
>
> >  (A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and
> >
> >  (B) the employee would be personally liable to the claimant according to Texas law; and
>
> (2) personal injury and death so caused by a condition or use of tangible personal or real property if the government unit would, were it a private person, be liable to the claimant according to Texas law.

Tex. Civ. Prac. & Rem. Code § 101.021. Here there is no allegation involving the use of a motor-driven vehicle or equipment, and therefore, Plaintiffs' entire claim rests on Tex. Civ. Prac. & Rem. Code § 101.021(2). Defendants aver that here, even if taking Plaintiffs' facts, there was no condition or use of tangible or real property. Defs.' Mot. at 37 (Docket No. 85). As previously mentioned Plaintiffs did not

---

[41] "This chapter [The Texas Tort Claims Act] does not apply to a claim: (1) based on an injury or death connected with any act or omission arising out of civil disobedience, riot, insurrection, or rebellion; or (2) arising out of *assault*, battery, *false imprisonment*, or any other intentional tort, including a tort involving disciplinary action by school authorities." Tex. Civ. Prac. Rem. Code § 101.057 (emphasis added).

respond to Defendants' voluminous arguments in this regard nor challenge their interpretation of relevant Texas law.

Dispatcher Villarreal grossly misinterpreted information and relayed that gross misrepresentation using various forms of telecommunications devices. But the use of computers, telephones, or records to collect and communicate information is not a use of tangible personal property. *Cherry v. Tex.* Dep't of Crim. J., 978 S.W.2d 240, 242,43 (Tex.App.–Texarkana 1998, no pet.); *see also Axtell v. Univ. of Tex.*, 69 S.W.3d 261, 267 (Tex.App.–Austin 2002, no pet.). Moreover, "information is not transformed into tangible property when it is communicated by a fax machine, a telephone, a telegram, or a computer." Ibid at 266-67; *see also Sawyer v. Tex. Dep't of Crim. J.*, 983 S.W.2d 310, 312 (Tex.App.–Houston [1st Dist.] 1998, pet. denied). Police dispatch radios and receivers, as well as the CADTMS system are legally indistinguishable, for the purposes of § 101.021, from a fax machine, a telephone, a telegram, or a computer. The Court agrees with Defendants that as a matter of law a reasonable jury could not conclude that a condition or use of tangible propery caused the death of Ricardo Moreno and so, these claims must be dismissed as a matter of law.

Individual defendants cannot be sued in their individual capacity under Texas law for tort-based claims. Tex. Civ. Prac. & Rem. Code § 101.106(e).   In that vein, a suit against the City and a suit against individual defendants in their official capacity, must be consolidated as a suit against the City. *Ibid.* Finally, because the City has not waived its governmental immunity as it relates to any presently alleged tort-based claim, the state-based causes of action against the City must be dismissed in light of the City's governmental immunity as a matter of law.[42]

## CONCLUSION

---

[42] The Texas Tort Claims Act provides a limited waiver of sovereign immunity which has not been met here, and moreover it permits certain tort claims to be brought against a governmental unit under certain circumstances that have also not been met here. *Tex. Dep't of Criminal Justice v. Miller*, 51 S.W.3d 583, 587 (Tex. 2001).

A man his died for seemingly avoidable reasons. Where responsibility lies for avoiding such finality is the true essence of this case. And so, this has from the very onset been a difficult case. The Court is mindful that it should "not second guess the officer on the beat who must make split second decisions in life-or-death situations." *Bell v. Mahan*, 47 F.3d 424 (5th Cir. 1995) (describing the split-second decision making of that particular officer not only as legitimate but a heroic exercise of authority). But the undisputed evidence in this case shows that the grand majority of the decisions made during this several-hour episode were never made in the heat of the moment and only after the deliberation of the City of Brownsville's highest ranking police officers. It will now be the duty of citizens of this community to undertake an examination of the evidence in a quest for recreating the events described by so many into a single, cogent story line to aid the Court in future determinations.

1. Dismissed Parties

Nevertheless, the City of Brownsville is DISMISSED without further responsibility in this action because Plaintiffs have failed to establish as a matter of law that the City could be found liable in light of *Monell.* 436 U.S. at 694. Moreover, the City of Brownsville enjoys governmental immunity from state-based tort claims that it has not waived and so any liability under Texas law cannot be assigned upon it as a matter of law. *Tex. Dep't of Criminal Justice v. Miller*, 51 S.W.3d 583, 587 (Tex. 2001).

Defendant Ida Villarreal is also DISMISSED without further responsibility in this action. Although her actions of November 11, 2008, are far from praise-worthy, given that the rights she is alleged to have violated were not clearly established on November 11, 2008, and so, she is entitled to qualified immunity as a matter of law. *See Jennings*, 644 F.3d 297.

2. Dismissed Claims

To the extent that Plaintiffs' substantive due process claim simply recast other claims as substantive due process claims, the substantive due process claim is

DISMISSED and Defendants' Motion for Summary Judgment in this regard is GRANTED.

To the extent that Plaintiffs alleged traditional equal protection claims, those claims are DISMISSED and Defendants' Motion for Summary Judgment in this regard is GRANTED.

To the extent that Plaintiffs alleged class-of-one equal protection claims, those claims are DISMISSED and Defendants' Motion for Summary Judgment in this regard is GRANTED.

To the extent that Plaintiffs alleged Texas negligence claims, those claims are DISMISSED and Defendants' Motion for Summary Judgment in this regard is GRANTED.

To the extent that Plaintiffs alleged Texas tort-based claims, those claims are DISMISSED and Defendants' Motion for Summary Judgment in this regard is GRANTED.

3. Viable Claims

To the extent that Plaintiffs allege Moreno's Fourth Amendment right to be free from an unlawful search on November 11, 2008, was violated, those allegations will proceed to trial. Defendants' Motion for Summary Judgment in this regard is DENIED.

To the extent that Plaintiffs allege Moreno's Fourth Amendment right to be free from an unlawful seizure on November 11, 2008, was violated, those allegations will proceed to trial. Defendants' Motion for Summary Judgment in this regard is DENIED.

To the extent that Plaintiffs allege Moreno's Fourth Amendment right to be free from excessive force on November 11, 2008, was violated, those allegations will proceed to trial. Defendants' Motion for Summary Judgment in this regard is DENIED.

To the extent that Plaintiffs allege Moreno's Fourth Amendment right to be free from the unlawful execution of a lawful search and seizure on November 11,

2008, was violated, those allegations will proceed to trial. Defendants' Motion for Summary Judgment in this regard is DENIED.

To the extent that Plaintiffs allege Defendants Garcia, Paschall, Arnold, Rodriguez, and Mascorro, failed to intervene to protect Moreno's constitutional rights on November 11, 2008, those allegations will proceed to trial. Defendants' Motion for Summary Judgment in this regard is DENIED.

To the extent that Plaintiffs allege Moreno's Fifth Amendment procedural due process right was violated on November 11, 2008, those allegations will proceed to trial. Defendants' Motion for Summary Judgment in this regard is DENIED.

The parties should proceed to go to trial in light of the remaining parties and claims outlined above.

It is so ORDERED. Done this ___26th___ day of ___August___ 2011.

Felix Recio
United States Magistrate Judge